### JOHN T. DYER QUARRY CO. v. SCHUYLKILL STONE CO.

(Circuit Court, D. New Jersey. March 6, 1911.)

*(Syllabus by the Court.)*

1. TRADE-MARKS AND TRADE-NAMES (§§ 3, 9*)—NAMES SUBJECT OF OWNERSHIP —GEOGRAPHICAL AND GEOLOGICAL TERMS.

    The words "Birdsboro Trap Rock" are a combination of a geographical term and a geological term, the former qualifying the latter and together with the latter expressing the true descriptive name of the rock; the quality of trap varying with the locality in which it is found.

    [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 4–7, 13; Dec. Dig. §§ 3, 9.*]

2. TRADE-MARKS AND TRADE-NAMES (§§ 3, 9*)—NAMES SUBJECT OF OWNERSHIP —GEOGRAPHICAL AND GEOLOGICAL TERMS.

    No one can by the adoption of a purely descriptive name or a geographical name which carries with it the nature or quality of a natural product there yielded exclude others from truthfully describing or employing terms indicative of such nature or quality.

    [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 4–7, 13; Dec. Dig. §§ 3, 9.*]

3. TRADE-MARKS AND TRADE-NAMES (§ 1*)—NATURE OF RIGHT.

    The owner of a trade-mark proper has an exclusive right good "as against all the world" to its use in connection with articles for which it was appropriated and to which it has been applied, and a mark under which no such exclusive right can exist in the owner or appropriator cannot constitute a trade-mark proper.

    [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 1; Dec. Dig. § 1.*]

4. TRADE-MARKS AND TRADE-NAMES (§ 9*)—NAMES SUBJECT OF OWNERSHIP— GEOGRAPHICAL NAMES—UNFAIR COMPETITION IN TRADE.

    Subject possibly to an exception where the relationship of the appropriator of the name to the place is, under the circumstances of a given case, such that fraud will be presumed ipso facto from the use of that name by another, whatever may be the secondary meaning gained by a purely geographical name there is no exclusive right of property in the name in its application to vendible articles, and its use by others can be prevented, not on the ground of trade-mark infringement, but only on that of unfair competition in trade.

    [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 13; Dec. Dig. § 9.*]

---

5. TRADE-MARKS AND TRADE-NAMES (§ 3*)—NAMES SUBJECT OF OWNERSHIP—
GEOGRAPHICAL NAMES.

The facts that a truly descriptive name has first been applied by one
to an article manufactured, produced or sold by him, whether the article
be old or new with him or others, and that such term has acquired by
association a secondary meaning pointing to origin or ownership, can-
not operate to preclude others having a right to manufacture, produce or
sell articles of the same kind from fairly applying to them such truly
descriptive name.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent.
Dig. §§ 4–7; Dec. Dig. § 3.*]

6. TRADE-MARKS AND TRADE-NAMES (§ 59*)—NAMES SUBJECT OF OWNERSHIP—
GEOGRAPHICAL OR DESCRIPTIVE NAMES.

No one can through the adoption and application of an arbitrary or
fanciful word as a trade-mark, whether registered or unregistered, ex-
clude others from using in connection with similar articles a geographical
or descriptive name open to the public, on the ground that the latter
name so closely resembles the former as to be calculated to mislead the
purchasing public as to the origin, manufacture or ownership of the arti-
cle sold, or for any other reason.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent.
Dig. §§ 68–72; Dec. Dig. § 59.*]

Use of geographical names as trade-mark or trade-name, see notes to
Hoyt v. J. T. Lovett Co., 17 C. C. A. 657; Illinois Watch-Case Co. v. El-
gin Nat. Watch Co., 35 C. C. A. 242.]

*(Additional Syllabus by Editorial Staff.)*

7. WORDS AND PHRASES—"TRAP"—"TRAPPOID"—"TRAPPOUS"—"TRAPPOSE"—
"TRAPPEAN"—"TRAPPE"—"TRAPPA."

The word "trap," although derived from the Swedish word "trappa,"
meaning a step or stair, has been known and used as a common English
name for igneous rock for more than 100 years. And the words "trap-
poid," "trappous," "trappose," "trappean," are adjectives related to trap.
But the word "trappe" is not and never has been in this country a de-
scriptive name for trap rock. The designation "trappe rock" is unknown
to the English language, and if the word "trappe" be known to that lan-
guage it bears no relationship whatever to rock. The word "trappe" ap-
pears to be an obsolete Anglo-Saxon word signifying, not rock, but arti-
fice or stratagem.

In Equity. Bill by the John T. Dyer Quarry Company against
the Schuylkill Stone Company. Bill dismissed.

J. Bonsall Taylor, Louis M. Childs, and Cyrus N. Anderson, for
complainant.

Frank P. Prichard, for defendant.

BRADFORD, District Judge. The John T. Dyer Quarry Com-
pany, a corporation of Pennsylvania, has filed a bill in equity against
the Schuylkill Stone Company, a corporation of New Jersey, alleging
trade-mark infringement and unfair competition in trade, and pray-
ing for an injunction and an account. It appears from the record
that in 1893 John T. Dyer established a stone quarry outside but
within a mile of Birdsboro, Berks County, Pennsylvania, and there
carried on the business of quarrying and crushing stone and selling
the same. He continued to conduct this business until December,
1895, when it was transferred to The John T. Dyer Company, which

thereafter carried it on until December, 1900, when it was re-transferred to Dyer who thereupon transferred the same to the complainant, which has carried on the business since that time. The stone quarried, crushed and sold by the complainant is of igneous origin, commonly known as trap rock, and obtained from a dike of several miles in extent. It is largely used for macadamizing roads and paths. The first quarry opened in the above mentioned trap-dike was that of Dyer, and for some time, though the evidence does not clearly disclose how long, the stone there quarried was designated as "Birdsboro Trap Rock" by affixing to the cars carrying the same labels bearing those words. Later the words "Birdsboro Trappe Rock" were so used by Dyer and his successors in business including the complainant, until 1907 when the carrying companies objected to and prevented the further use of such labels on their cars. The complainant applied in June, 1907, to the United States patent office for the registration of the words "Birdsboro Trappe Rock" as a trade-mark for quarried stone. The application was granted and those words were registered September 10, 1907, as a trade-mark of the complainant for such stone. In the summer of 1908 the defendant opened a quarry in the above mentioned trap-dike and since then has carried on the business of quarrying, crushing and selling trap rock. The crushed stone is sold by it, not as "Birdsboro Trappe Rock," but as "Birdsboro Trap Rock." The complainant contends that its exclusive rights as a trade-mark owner have been infringed by the defendant through such use of the words "Birdsboro Trap Rock," and further, that the defendant has by its use of those words been guilty of unfair competition in trade. The branch of the case relating to alleged trade-mark infringement will first be considered. It is not altogether clear from the pleadings whether, aside from alleged unfair competition in trade, the complainant bases its claim to relief wholly upon rights asserted under the words "Birdsboro Trappe Rock" as a registered trade-mark or upon rights under not only those words but the words "Birdsboro Trap Rock" as a common law trade-mark. While the bill gives prominence to the registered trade-mark and does not directly allege that the words "Birdsboro Trap Rock" had ever been adopted or appropriated by the complainant, or any of its predecessors in the business of quarrying stone from the Birdsboro trap-dike, it is averred in paragraph XII that those words as applied to stone quarried and sold by it are its "exclusive property," and the injunctive prayer of the bill is not expressly and specifically limited to infringement of the registered mark, but is to the effect that the defendant be compelled to desist from "infringing your orator's exclusive trade-mark rights." Further, there are diversity of citizenship between the parties and a prayer that the defendant be decreed to pay to the complainant $10,-000 damages. Hence the jurisdictional requisites for a suit for infringement of an unregistered common law trade-mark are satisfied. Aside from any question whether the words used respectively by the complainant and defendant have been so "applied" or "affixed" as to render infringement legally possible, it is evident that the defendant cannot be held liable in this suit as an infringer unless the complain-

ant had a valid common law trade-mark consisting of the words "Birdsboro Trap Rock" and an exclusive right to use those words in connection with stone quarried from the dike in question, or a valid registered trade-mark consisting of the words "Birdsboro Trappe Rock" and a right to prevent the defendant from or hold it liable for using the words "Birdsboro Trap Rock" as only colorably different from such registered trade-mark. Even on the assumption that, so far as trade-mark infringement is concerned, the complainant is confined by the pleadings to the assertion of whatever rights it may have under the registered mark, it is necessary to determine whether the words "Birdsboro Trap Rock" were subject to valid appropriation as a common law trade-mark for stone quarried by the complainant or its predecessors from the Birdsboro dike. For if those words were not so subject to appropriation, it will be found difficult, if not impossible, to recognize any right on the part of the complainant, through the mere substitution by its predecessors of the word "Trappe" for "Trap," either with or without registration, to exclude the defendant from using precisely the words which were not susceptible of exclusive appropriation. On the above assumption if the words "Birdsboro Trappe Rock" can be sustained as a valid registered or common law trade-mark the distinction between "Trappe" and "Trap" would be substantial and vital, and as the defendant has not used the word "Trappe" it could not, as hereafter will more fully appear, be held as a trade-mark infringer through its use of the word "Trap," whatever significance such use, coupled with other circumstances, might have on the question of unfair competition in trade. I am satisfied that on the evidence neither the complainant nor its predecessors had or could have had a right to an exclusive use of the words "Birdsboro Trap Rock" as a common law trade-mark in connection with stone quarried by it or them as above stated. Trap or trap rock has for many years and long before Dyer opened his quarry in 1893 been known to the public by that name, and its nature and uses thoroughly understood. Of towns of any considerable importance Birdsboro is nearest to the quarry of the complainant; and the words "Birdsboro Trap Rock" were appropriately employed to designate trap quarried from the dike in question; the geographical name indicating the locality of the dike and the other words, geological and generic in their nature, denoting a natural product. That these words, originally sought to be appropriated by Dyer in connection with the quarrying, crushing and selling of trap rock, were, and were intended to be, a purely descriptive geological term coupled with a purely geographical term indicating the locality where the rock was found there can be no doubt. Johnson, the general superintendent of Dyer's quarries at and after the time they were opened, testified:

"XQ. 42. You say that after you discovered the quarry you and Mr. Dyer named it? A. Yes, sir. XQ. 43. How did you come to name it 'Birdsboro', had you ever heard of Birdsboro before? A. Did we ever hear of it? XQ. 44. Yes. A. I should think I did. * * * XQ. 47. You say that you had heard the word Birdsboro before. Where had you heard it? A. Passing through it, and knew the name of the town in Pennsylvania. XQ. 48. How did you come to name these quarries Birdsboro quarries? A. Well, the ridge ran right

from Birdsboro to the quarries.  XQ. 49. You wanted to indicate the place where the stone came from?  A. Yes, sir."

In selling the stone as "Birdsboro Trap Rock" the words employed were not arbitrary or symbolical, but descriptive of the thing sold, pointing to its quality as dependent on locality, and containing a geographical designation of such locality, in the sense of referring, not exclusively to the precise point or points in the trap-dike from which the stone was then being quarried and sold, but generally to the dike from a portion of which stone was then being taken.

The use of the words "Birdsboro Trap Rock" in connection with stone quarried by Dyer and his successors from the dike was not only natural, but most appropriate, as giving the common and well understood name of the rock, indicating to the public in an intelligible manner its location, and pointing to its quality as dependent upon or determined by locality.  For it not only appears from the evidence but is a well-known fact of which the court in the absence of evidence on the point probably would take notice, that the quality and value of trap rock vary with the different dikes from which it is taken.  And it is quite usual that the name of a town, river, valley or other physical feature, natural or artificial, is given to rock contained in or quarried from beds or deposits, whether within or contiguous to or only in the vicinity or such town, river, valley or physical feature.  Carrara marble, Carthage marble, Cripple Creek rock, Barre granite, Marysville stone, Bergen Hill trap rock, Marietta sandstone, and Spring Mill stone, not to mention other instances disclosed in the evidence, sufficiently serve as illustrations.  Dyer and his successors in business including the complainant recognized in a practical way this common usage in the wording of their letter heads and advertising matter. Thus the following appears at the head of a letter written by Dyer in 1895 :

"Howellville Blue Stone.  Howellville, Chester Co., Pa.   Birdsboro Trap Rock.  Birdsboro, Berks Co., Pa.   John T. Dyer. General Contractor.  Crushed and Building Stone.  Norristown, Pa."

And on the face of a business card of the complainant used in 1907 the following is found:

"The John T. Dyer Quarry Co., Norristown, Pa.   Shippers of Crushed and Building Stone for Macadam, Concrete, Ballast, Foundations, &c.   Birdsboro Trap Rock.  Howellville Blue Stone.  Pennypack Trap Rock.  Spring Mill Stone.  Locksley Stone."

When or shortly after Dyer opened his quarry in 1894 there was within less than a mile from it a small railroad station called Hampton. This station was subsequently moved up near the quarry and its name changed to Trap Rock.  About it sprang up a little settlement bearing the same name and inhabitated by Italian laborers whose number has never equalled two hundred.  Had Dyer omitted "Birdsboro" from "Birdsboro Trap Rock" and substituted for it either "Hampton" or "Trap Rock" few would have known, and no one, if "Trap Rock" only had been substituted, could have inferred from the name itself, where the stone was procured.  The complainant contends that "the scientific geological name for the dike on which complainant's quarries are lo-

185 F.—36

cated is 'Flying Hill Dike.'" The evidence does not sustain this contention; but were it otherwise it would be immaterial. In adopting an appropriate geographical name for a locality where it is proposed to carry on the process of manufacture or production one is not so much concerned with the "scientific geological" name of the locality as with a designation which will serve to identify the place in the mind of the public generally. But by using the name of a town of importance in the near neighborhood of the quarry, sufficient notice was given to those dealing or proposing to deal with Dyer or his successors of the locality from which the stone was obtained.

It is a general rule that merely geographical, generic or descriptive terms cannot validly be appropriated as trade-marks proper or technical trade-marks. In Canal Co. v. Clark, 13 Wall. 311, 20 L. Ed. 581, in which it was held that the words "Lackawanna coal" could not be appropriated by one person to the exclusion of others mining and selling coal from the Lackawanna Valley, the court said:

"No one can claim protection for the exclusive use of a trade-mark or trade-name which would practically give him a monopoly in the sale of any goods other than those produced or made by himself. If he could, the public would be injured rather than protected, for competition would be destroyed. Nor can a generic name, or a name merely descriptive of an article of trade, of its qualities, ingredients, or characteristics, be employed as a trade-mark and the exclusive use of it be entitled to legal protection. * * * And it is obvious that the same reasons which forbid the exclusive appropriation of generic names or of those merely descriptive of the article manufactured and which can be employed with truth by other manufacturers, apply with equal force to the appropriation of geographical names, designating districts of country. Their nature is such that they cannot point to the origin (personal origin) or ownership of the articles of trade to which they may be applied. They point only at the place of production, not to the producer, and could they be appropriated exclusively, the appropriation would result in mischievous monopolies. * * * It must then be considered as sound doctrine that no one can apply the name of a district of country to a well-known article of commerce, and obtain thereby such an exclusive right to the application as to prevent others inhabiting the district or dealing in similar articles coming from the district, from truthfully using the same designation. * * * True it may be that the use by a second producer, in describing truthfully his product, of a name or a combination of words already in use by another, may have the effect of causing the public to mistake as to the origin or ownership of the product, but if it is just as true in its application to his goods as it is to those of another who first applied it, and who therefore claims an exclusive right to use it, there is no legal or moral wrong done. Purchasers may be mistaken, but they are not deceived by false representations, and equity will not enjoin against telling the truth."

And in Brown Chemical Co. v. Meyer, 139 U. S. 540, 11 Sup. Ct. 625, 35 L. Ed. 247, the court said:

"The general proposition is well established that words which are merely descriptive of the character, qualities or composition of an article, or of the place where it is manufactured or produced, cannot be monopolized as a trade-mark."

The words "Birdsboro Trap Rock," as already stated, had appropriate application to all of the rock contained in the dike in question. The law did not allow Dyer or his successors by mere adoption and application to acquire a monopoly in the use of language properly applicable to any and all stone quarried within the geographical limits of the Birdsboro trap-dike. Neither Dyer nor his successors owned or leased

the entire dike. No reason is perceived why other persons quarrying, crushing and selling the stone from the same dike should not, in the absence of fraud or unfair competition in trade, be permitted to use in connection with the business carried on by them, the words peculiarly appropriate to the stone in that dike by whomsoever quarried. Especially is this true in view of the fact that, unlike manufactured articles dependent for their excellence upon care and skill observed in their production, the quality of trap rock, like many other natural products, vegetable and mineral, largely depends upon the locality where found. No one can by the adoption of a purely descriptive name or a geographical name which carries with it the nature or quality of a natural product there yielded, exclude others from truthfully describing or employing terms indicative of such nature or quality.

Where, however, in the course of time and from the manner in which they have been employed, terms originally merely geographical or descriptive of the place where an article has been manufactured, produced or sold, have acquired a secondary meaning from their association in the mind of the purchasing public with a particular manufacturer, producer, or vendor, or with superior quality or excellence in the articles, to which such terms have been applied, resulting from care or skill observed in their manufacture, production or selection, the use of such terms, without explanation or distinctive marks, by third persons in connection with similar articles of their own, frequently has been restrained as amounting to unfair competition in trade. The name "Birdsboro Trap Rock" may have become associated in a limited sense with Dyer and have gained a secondary meaning pointing to the quarrying of that rock by him before the defendant opened its quarries. It is but natural that such should have been the case; for no one other than Dyer quarried from the Birdsboro trap-dike until the defendant commenced operations. But, unless possibly under exceptional circumstances not existing in this case, the acquisition by a mere geographical term of a secondary signification pointing to particular origin or ownership cannot convert that term into a technical or proper trade-mark. It cannot serve to exclude third persons from truthfully and fairly employing the same term in connection with similar articles manufactured, produced or sold by them. When such secondary meaning has been acquired the question becomes one, not of infringement of a trade-mark proper, but of unfair competition in trade. Much confusion on this point in the language of the cases is attributable to failure clearly to distinguish between the infringement of a trade-mark proper, which, as a violation of an exclusive right of property, need not involve fraud or wrongful intent, and such wrongful and fraudulent simulation of mere trade-names, description, dress or package as under the circumstances of a given case amounts only to unfair competition in trade in contradistinction to trade-mark infringement. It is further attributable to the fact that many of such cases were decided while the distinctive doctrine of unfair competition in trade was comparatively in its infancy, and long before it attained its present high development, and when relief against unfair practices by competitors in trade largely depended upon the enforcement of the exclusive rights existing under trade-marks proper. The manner in

which such trade-marks and mere non-exclusive trade-names or other designations have so often been loosely and unnecessarily treated or referred to as convertible terms has been calculated to mislead and been properly criticized by the text writers. Browne on Trade-Marks, § 91 et seq.; Paul on Trade-Marks, § 160. It is now, however, a generally recognized fact that, while the law of trade-marks is but a branch of the larger subject of unfair competition in trade, there is an important distinction between the two when viewed in contradistinction to each other, namely, that the owner of a trade-mark in its legal sense has an exclusive right of property in it for the protection of the public and himself, but that a person engaged in business and not having a trade-mark proper has a right in equity to be protected against fraudulent and wrongful attempts by others to filch away his business and deceive the public by palming off their property as his, whether those attempts are made through the use of geographical words or other non-exclusive terms. In Shaver v. Heller & Merz Co., 108 Fed. 821, 48 C. C. A. 48, Judge Sanborn well said:

"The contention of counsel for the appellants here is a confusion of the bases of two classes of suits,—those for infringement of trade-marks, and those for unfair competition in trade. Suits of the former class rest on the ownership of the trade-marks. Suits of the latter class are founded upon the damage to the trade of the complainants by the fraudulent passing of the goods of one manufacturer for those of another. In the former, title to the trade-marks is indispensable to a good cause of action; in the latter, no proprietary interest in the words, names, or means by which the fraud is perpetrated is requisite to maintain a suit to enjoin it. * * * Geographical terms and words descriptive of the character, quality, or places of manufacture or of sale of articles cannot be monopolized as trade-marks. * * * But the use of such geographical or descriptive terms to palm off the goods of one manufacturer or vendor as those of another, and to carry on unfair competition, may be lawfully enjoined by a court of equity to the same extent as the use of any other terms or symbols."

In Elgin Nat. Watch Co. v. Illinois Watch Co., 179 U. S. 665, 21 Sup. Ct. 270, 45 L. Ed. 365, the court not only clearly recognized the distinction between the infringement of trade-marks proper and unfair competition in trade, but decided that the attaching to a geographical term of a secondary signification pointing to origin, manufacture or ownership, would not convert such term into a trade-mark. There the court had under consideration the trade-mark registration act of March 3, 1881 (21 Stat. 502, c. 138 [U. S. Comp. St. 1901, p. 3401]), which did not define trade-marks, but, assuming their existence and ownership, provided for their registration for use in commerce with foreign nations or with the Indian tribes, and conferred jurisdiction upon the courts of the United States to enjoin or award damages for the infringement of trade-marks as so used and registered, regardless of the amount in controversy or the citizenship of the parties. As all the parties were citizens of the same state, the case turned on the question of jurisdiction, which did not exist unless "Elgin," the name of a city in Illinois, was a valid trade-mark as applied to watches there manufactured. The court said:

"Trade-marks are not defined by the act, which assumes their existence and ownership, and provides for a verified declaration by applicants for regis-

tration that they have the exclusive right to the particular trade-mark sought to be registered. The term has been in use from a very early date, and, generally speaking, means a distinctive mark of authenticity, through which the products of particular manufacturers or the vendible commodities of particular merchants may be distinguished from those of others. It may consist in any symbol or in any form of words, but as its office is to point out distinctively the origin or ownership of the articles to which it is affixed, it follows that no sign or form of words can be appropriated as a valid trademark, which from the nature of the fact conveyed by its primary meaning, others may employ with equal truth and with equal right, for the same purpose. And the general rule is thoroughly established that words that do not in and of themselves indicate anything in the nature of origin, manufacture or ownership, but are merely descriptive of the place where an article is manufactured or produced, cannot be monopolized as a trade-mark. * * * But it is contended that the name 'Elgin' had acquired a secondary signification in connection with its use by appellant, and should not, for that reason, be considered or treated as merely a geographical name. It is undoubtedly true that where such a secondary signification has been acquired, its use in that sense will be protected by restraining the use of the word by others in such a way as to amount to a fraud on the public, and on those to whose employment of it the special meaning has become attached. In other words, the manufacturer of particular goods is entitled to the reputation they have acquired, and the public is entitled to the means of distinguishing between those, and other, goods; and protection is accorded against unfair dealing, whether there be a technical trade-mark or not. The essence of the wrong consists in the sale of the goods of one manufacturer or vendor for those of another. If a plaintiff has the absolute right to the use of a particular word or words as a trade-mark, then if an infringement is shown the wrongful or fraudulent intent is presumed, and although allowed to be rebutted in exemption of damages, the further violation of the right of property will nevertheless be restrained. But where an alleged trade-mark is not in itself a good trade-mark, yet the use of the word has come to denote the particular manufacturer or vendor, relief against unfair competition or perfidious dealing will be awarded by requiring the use of the word by another to be confined to its primary sense by such limitations as will prevent misapprehension on the question of origin. In the latter class of cases such circumstances must be made out as will show wrongful intent in fact, or justify that inference from the inevitable consequences of the act complained of. * * * These and like cases do not sustain the proposition that words which in their primary signification give notice of a general fact, and may be used for that purpose by every one, can lawfully be withdrawn from common use in that sense; but they illustrate the adequacy of the protection from imposition and fraud in respect of a secondary signification afforded by the courts. In the instance of a lawfully registered trade-mark, the fact of its use by another creates a cause of action. In the instance of the use in bad faith of a sign not in itself susceptible of being a valid trade-mark but so employed as to have acquired a secondary meaning, the whole matter lies in pais. It is to be observed, however, that the question we are considering is 'not whether this record makes out a case of false representation, or perfidious dealing, or unfair competition, but whether appellant had the exclusive right to use the word 'Elgin' as against all the world. Was it a lawfully registered trade-mark? If the absolute right to the word as a trade-mark belonged to appellant, then the circuit court had jurisdiction under the statute to award relief for infringement; but if it were not a lawfully registered trade-mark, then the circuit court of appeals correctly held that jurisdiction could not be maintained. And since while the secondary signification attributed to its use of the word might entitle appellant to relief, the fact that primarily it simply described the place of manufacture, and that appellees had the right to use it in that sense, though not the right to use it, without explanation or qualification, if such use would be an instrument of fraud, we are of opinion that the general rule applied, and that this geographical name could not be employed as a trade-mark and its exclusive use vested in appellant, and that it was not properly entitled to be registered as such."

It does not appear that the doctrine of the Elgin case has been repudiated, qualified or criticized in any subsequent decision. On the contrary, it has been cited both by the Supreme Court and by other tribunals with approval. In that case the court dealt with the nature and characteristics of trade-marks proper or technical trade-marks as contrasted with unfair competition in trade growing out of the fraudulent use of mere geographical names clothed with a secondary meaning pointing to origin, manufacture or ownership, and held that such names could not be registered under the act of March 3, 1881, for the reason that they were not proper trade-marks, not being words susceptible of exclusive appropriation as against all persons other than the appropriator. The court said:

"The benefits of the act cannot be availed of if the alleged trade-mark is not susceptible of exclusive ownership as such."

And further:

"The question we are considering is * * * whether appellant had the exclusive right to use the word 'Elgin' as against all the world. Was it a lawfully registered trade-mark?"

There was a clear legislative intent that the provisions of the act should be applicable to all trade-marks used in commerce with foreign nations or with the Indian tribes; for in the first section it was declared generally and without qualification or restriction that "owners of trade-marks" so employed might obtain registration of the same by complying with the requirements therein specified. And there was an equally clear legislative recognition of the exclusive nature of trade-marks proper; for in the seventh section it was provided that "any person" who should "reproduce, counterfeit, copy or colorably imitate any trade-mark registered under this act and affix the same to merchandise of substantially the same descriptive properties as those described in the registration, shall be liable," &c. Further, in the second section it was provided that in order to create any right in the applicant for registration the application should be accompanied by a verified written declaration to the effect that the applicant "has at the time a right to the use of the trade-mark sought to be registered, and that no other person, firm, or corporation has the right to such use, either in the identical form or in any such near resemblance thereto as might be calculated to deceive." The Elgin case was not decided on any theory that the act of Congress there considered made essential, for the purposes of registration, the existence of any exclusive right in the owner of trade-marks, not requisite in the case of unregistered trade-marks proper used in foreign or Indian commerce, or on any theory that, aside from any question of registration, the essential nature and qualities of a trade-mark proper as used in such commerce are different from those of a trade-mark proper not so employed. The Supreme Court distinctly declared with respect to trade-marks generally that "no sign or form of words can be appropriated as a valid trade-mark, which from the nature of the fact conveyed by its primary meaning, others may employ with equal truth, and with equal right for the same purpose," and further, that "trade-marks are not defined by the act, which assumes their existence, and ownership, and provides for a

verified declaration by applicants for registration that they have the exclusive right to the particular trade-mark sought to be registered." The Elgin case thus fully supports the propositions that the owner of a trade-mark proper has an exclusive right good "as against all the world" to its use in connection with articles for which it was appropriated and to which it has been applied, and that a mark under which no such exclusive right can exist in the owner or appropriator cannot constitute a trade-mark proper. The decision, as does the act taken as a whole, excludes all idea of a proper or technical trade-mark good as against some but not all persons. To assume that a purely geographical name may through any secondary meaning acquired by it pointing to origin, manufacture, or ownership, become a strict trade-mark as against one or more persons or classes of persons, and not a technical trade-mark as to others, involves in my judgment an absurdity. That exclusiveness of right in a trade-mark, whether registered or unregistered, may be limited by matter in pais as against some persons and not against others seems an utterly unsound proposition, due regard being had to the distinction between a trade-mark in its proper legal sense as property, and a mere non-exclusive trade-name or designation, the use of which can only be enjoined to prevent unfair competition in trade. If the proposition were tenable a wide door to uncertainty and confusion would be open on the question 'how far and against whom in a given case the trade-mark must be considered exclusive, the decision of the point turning on the special circumstances. A purely geographical name having an acquired secondary signification pointing to particular origin, manufacture or ownership, and first appropriated and applied by one to articles produced, manufactured or sold by him, is either a trade-mark in the proper legal sense of the term or it is not. If it be such trade-mark, its owner not only may use it in his business but by virtue of its first appropriation and application by him has as his property a right to prevent all or any other persons from using it whether innocently or fraudulently, in connection with the sale of articles similar to those to which it has been applied by him. And if it be not a trade-mark proper, one who has first appropriated such geographical name and applied it may under certain circumstances have a right to exclude its use in connection with similar articles by persons whose place of business may or may not bear a certain relation to the territorial limits of the locality to which such geographical name is properly applicable; but his right to prevent such use of the name by others, either absolutely or unless the same be accompanied with explanatory matter calculated to prevent deception or confusion, does not grow out of or rest upon any right of property in the name, but exists in equity for the prevention of unfair competition in trade.

Undoubtedly isolated expressions are to be found in some cases which, if viewed aside from the facts involved and points decided and other language employed, seem at variance with the conclusion thus far reached. Thus in Newman v. Alvord, 51 N. Y. 189, 10 Am. Rep. 588, it was said:

"It is objected that the plaintiffs could not adopt the name of a place as a trade-mark. * * * I can perceive no reason why it may not be the name

of a place. * * * It is sometimes said, in the cases to which our attention has been called, that the claimant of a trade-mark must have the exclusive right to it. This form of expression, I apprehend, is not strictly accurate. The right must be exclusive as against the defendant. It is generally sufficient, in such cases, if the plaintiff has the right and the defendant has not the right to use it."

But it is clear that in using the term "trade-mark" in the above quoted language the court did not refer to a proper or technical trade-mark. Newman v. Alvord involved unfair competition in trade and was properly decided on that ground. The reasons given for restraining the use of the word "Akron" were that "the defendants not only used the word Akron, as applied to their cement, for a fraudulent and dishonest purpose, but there is the additional element that they could not truthfully use it." Further, the court in support of its holding quoted the following passage from the opinion of Lord Justice Gifford in Lee v. Haley, L. R. 5 Ch. App. Cas. 155:

"I quite agree that they [the plaintiffs] have no property in the name, but the principle upon which the cases on this subject proceed is, not that there is property in the word, but that it is a fraud on a person who has established a trade, and carries it on under a given name, that some other person should assume the same name, or the same name with a slight alteration, in such a way as to induce persons to deal with him in the belief that they are dealing with the person who has given a reputation to the name."

In questioning the accuracy of the statement that "the claimant of a trade-mark must have the exclusive right to it," saying that "the right must be exclusive as against the defendant," it being "generally sufficient, in such cases, if the plaintiff has the right and the defendant has not the right to use it," the court in Newman v. Alvord manifestly had in mind the right of the appropriator of a geographical name to be protected against its wrongful and fraudulent use in unfair competition by the defendant, and not the vested exclusive property right attached to a trade-mark proper. For a trade-mark proper is created by the adoption of an arbitrary sign, name or symbol and its original application to certain vendible articles, and both such adoption and application must be the acts of the appropriating owner; and no third person, whether a defendant or not, can by any wrongful or fraudulent conduct on his part convert another person into a trade-mark owner who in the absence of such conduct would not be such owner. Under certain circumstances the distinction between infringement of a trade-mark proper and unfair competition in trade may become academic rather than of practical importance. One may bear such relationship to a place, the name of which he has adopted as a trade designation or part of the good will of his business, that the use by another in connection with similar business of that name without the consent of the former or proper explanatory matter will per se be sufficient evidence of fraudulent competition. In such case so far as results are concerned the question of unfair competition on the one hand, or, on the other, trade-mark infringement is unimportant. Thus, where one conducting an industry in a particular place bearing a purely geographical name is the exclusive owner of all the land within the territorial limits to which the name applies and is the only person engaged within such limits in such or similar business and has adopted and applied such geo-

graphical name to articles sold by him in the business there carried on, and others conducting a similar business elsewhere apply to their articles the same name, often fraudulent intent fairly may and will be inferred and injunctive relief granted accordingly.

Nothing that has been said is intended to conflict with the idea that a geographical name of a locality may be lost either by change or substitution of a different name, or by its disuse otherwise caused as a territorial designation, and that in such case the original name may have been wholly divested of its primary signification and become an arbitrary or fanciful name and as such may serve as a trade-mark proper. One cannot truthfully adopt a name as the name of the place where his goods are manufactured, produced or sold, if at the time of manufacture, production or sale, no place bore such name. A careful examination of the cases has satisfied me that, subject possibly to an exception where the relationship of the appropriator of the name to the place is, under the circumstances of a given case, such that fraud will be presumed ipso facto from the use of that name by another, whatever may be the secondary meaning gained by a purely geographical name, there is no exclusive right of property in the name in its application to vendible articles, and that its use by others can be prevented, not on the ground of trade-mark infringement, but only on that of unfair competition in trade. In Pillsbury-Washburn Flour Mills Co. v. Eagle, 86 Fed. 608, 618, 30 C. C. A. 386, 396, 41 L. R. A. 162, the circuit court of appeals for the seventh circuit said:

"The distinction, both in the English and American cases, is between those where a geographical name has been adopted and claimed as a trade-mark proper, and those where, as in the case at bar, it has been adopted first as merely indicating the place of manufacture, and afterwards, in course of time, has become a well-known sign and synonym for superior excellence. In the latter class of cases, persons residing at other places will not be permitted to use the geographical name so adopted as a brand or label for similar goods for the mere purpose by fraud and false representation of appropriating the good will and business which long-continued industry and skill and a generous use of capital has rightfully built up."

There is a strong analogy between the use of a personal name common to two or more individuals engaged independently of each other in the same or substantially similar kinds of business, and the use, as applied to the sale of articles, by two or more individuals independently of each other of a geographical term which has acquired a secondary meaning pointing to production, manufacture or sale of the articles by one of such persons to the exclusion of the others. One cannot be restrained, aside from statutory enactment, from fairly using his own name in connection with the sale of articles because others bearing the same name have been the first to apply it to similar articles. A common surname can no more be appropriated as a trade-mark proper than a merely geographical term. Howe Scale Co. v. Wyckoff, Seamans, &c., 198 U. S. 118, 25 Sup. Ct. 609, 49 L. Ed. 972, turned on the question of the existence of an exclusive right to the use of the surname "Remington." The court said:

"It is well settled that a personal name cannot be exclusively appropriated by any one as against others having a right to use it; and as the name 'Remington' is an ordinary family surname, it was manifestly incapable of exclu-

sive appropriation as a valid trade-mark, and its registration as such could not in itself give it validity. * * * Remington and Sholes were interested in the old company, and Remington continued as general manager of the new company. Neither of them was paid for the use of his name, and neither of them had parted with the right to that use. Having the right to that use, courts will not interfere where the only confusion, if any, results from a similarity of the names and not from the manner of the use. The essence of the wrong in unfair competition consists in the sale of the goods of one manufacturer or vendor for those of another, and if defendant so conducts its business as not to palm off his goods as those of the complainant the action fails."

In Herring, &c., Safe Co. v. Hall's Safe Co., 208 U. S. 554, 28 Sup. Ct. 350, 52 L. Ed. 616, the court said:

"The name of a person or a town may have become so associated with a particular product that the mere attaching of that name to a similar product without more would have all the effect of a falsehood. Walter Baker & Co. v. Slack, 130 Fed. 514 [65 C. C. A. 138]. An absolute prohibition against using the name would carry trade-marks too far. Therefore the rights of the two parties have been reconciled by allowing the use, provided that an explanation is attached. * * * Of course the explanation must accompany the use, so as to give the antidote with the bane."

Three instructive cases in this connection are Saxlehner v. Eisner & Mendelson Co., 179 U. S. 19, 21 Sup. Ct. 7, 45 L. Ed. 60; French Republic v. Saratoga Vichy Co., 191 U. S. 427, 24 Sup. Ct. 145, 48 L. Ed. 247, and Saxlehner v. Wagner, 216 U. S. 375, 30 Sup. Ct. 298, 54 L. Ed. 525. In the first named case it was held that, although one Saxlehner was the first to appropriate and use the name "Hunyadi" in the sale of Hungarian bitter waters, and such name was at the time neither descriptive nor geographical, but purely arbitrary and fanciful as applied to medicinal waters, and a proper subject of a trade-mark, such name, having subsequently become generic and open to the public in Hungary, became public property here by virtue of our treaty with the Austro-Hungarian Empire in 1872, and not subject to exclusive appropriation; but that relief should be granted against the defendant on the ground of unfair competition in trade through the simulation of the bottle and label used by the complainant. French Republic v. Saratoga Vichy Co., 191 U. S. 427, 24 Sup. Ct. 145, 48 L. Ed. 247, was in Wolf Bros. & Co. v. Hamilton-Brown Shoe Co., 165 Fed. 413, 91 C. C. A. 665, correctly cited by the circuit court of appeals for the eighth circuit as authority for the proposition that "while it is true that a geographical name may not be exclusively appropriated as a trademark, yet a party, having adopted a geographical name as a designation of its goods, may be protected as against unfair trade." There the Supreme Court held that the word "Vichy," as applied to water drawn from natural springs in the commune of that name and long known under that name, having become generic and indicative of the character of the water, the Saratoga Vichy Company was at liberty to use the same word in connection with the sale of water drawn from the springs at Saratoga, but not in such manner as to be calculated to deceive and mislead the purchasing public, and palm off its water as foreign Vichy water. The court said:

"Geographical names often acquire a secondary signification indicative not only of the place of manufacture or production, but of the name of the manufacturer or producer and the excellence of the thing manufactured or pro-

duced, which enables the owner to assert an exclusive right to such name as against every one not doing business within the same geographical limits; and even as against them, if the name be used fraudulently for the purpose of misleading buyers as to the actual origin of the thing produced, or of palming off the productions of one person as those of another."

With respect to the right of the complainants to the name before it had become merely "generic and indicative of the character of the water," the court said:

"As the waters of Vichy had been known for centuries under that name there is reason for saying the plaintiffs had in 1872 acquired an exclusive right to the use of the word 'Vichy' as against everyone whose waters were not drawn from the springs of Vichy, or at least, as observed by a French court 'from the same hydrographical region which may be called generally the basin of Vichy.' "

The court nowhere declared or referred to the geographical term "Vichy" as a proper or technical trade-mark, and in saying that the complainants had in 1872 acquired an exclusive right to the use of that word as against every one whose waters were not drawn from the springs of Vichy or its basin clearly recognized the non-exclusiveness of the right as against persons whose waters were drawn from such springs or basin and who made fair use of the name. In Saxlehner v. Wagner, 216 U. S. 375, 30 Sup. Ct. 298, 54 L. Ed. 525, it was held that the word "Hunyadi," originally the name of a Hungarian hero of the fifteenth century, had become in effect only a geographical expression, and that the owner of the Hunyadi Janos springs could not prevent a fair use of that name by others in selling artificial Hunyadi water. The court said:

"The plaintiff has no patent for the water, and the defendants have a right to reproduce it as nearly as they can. * * * If they do not convey, but, on the contrary, exclude the notion that they are selling the plaintiff's goods, it is a strong proposition that when the article has a well-known name they have not the right to explain by that name what they imitate. By doing so they are not trying to get the good will of the name, but the good will of the goods. * * * At the very least the family name has become the name for any natural water of a certain type coming from a more or less extensive district, if not from anywhere in Hungary. It does not belong to the plaintiff alone in this country, even if she is the only one now sending the water here. But if there is any well-founded doubt as to the right to use a personal trade-name with proper guards against deception to signify what one is imitating where one has the right to imitate, there can be none that one is at liberty to refer to a geographical expression to signify the source of one's model. 'Hunyadi' at best is now only a geographical expression in effect."

It is unnecessary to cite further authorities in support of the proposition that while the use by third persons of a merely geographical name which has acquired a secondary meaning pointing to particular manufacture, production or ownership will sometimes be prevented by a court of equity, even without express proof of fraudulent intent, the relief is based, not upon a right of property in the name, but upon an equitable right to exclude its use by others under such circumstances as would amount to wrongful and fraudulent competition in trade.

The question whether the words "Birdsboro Trap Rock" were susceptible of appropriation as a valid trade-mark may be viewed in another aspect. It is true that those words, in connection with the business of quarrying, crushing and selling stone, were first used by Dyer.

And it is owing to this fact that the complainant, his successor in business, claims that it has the exclusive right to use those words as a trade-mark or trade-name in connection with the selling of such crushed stone. When taken together the three words are a combination of a geographical term and a geological term, the former qualifying the latter and together with the latter expressing the true descriptive name of the rock in question. For, as before stated, the quality of trap varies with the localities in which it is found, and when its location is ascertained its quality is determined. The words "Birdsboro Trap Rock" are in no sense arbitrary or symbolical. Being truly descriptive I fail to perceive on what principle their adoption by Dyer could operate to exclude others having a right to quarry rock from the same dike from employing them. Dyer did not give the rock his own name. It took its name from the situation of the dike containing it. The name stands for the rock and not the quarryman or his employer. It is not a proper function of a trade-mark to create confusion and uncertainty or an unjust monopoly in the purchase and sale of vendible articles. If in the case of such a purely natural product as trap, not subjected in its preparation for the market to any peculiar, unusual or distinctive treatment, one person can sell it from a given dike as "Birdsboro Trap Rock" and other persons having equal right to sell the stone from the same dike are compelled to give it a different name, it is obvious that serious embarrassment and injustice may result. And it is wholly unnecessary that any one should be excluded from the use of the proper descriptive name, so long as he does not use it in such manner as to amount to unfair competition in trade. It is clearly to be gathered from the authorities as well as from principle that the facts that a truly descriptive name has first been applied by one to an article manufactured, produced or sold by him, whether the article be old or new with him or others, and that such term has acquired by association a secondary meaning pointing to origin or ownership, cannot operate to preclude others having a right to manufacture, produce or sell articles of the same kind from fairly applying to them such true descriptive name. Hostetter v. Fries (C. C.) 17 Fed. 620; Leclanche Battery Co. v. Western Electric Co. (C. C.) 23 Fed. 276; Rumford Chemical Works v. Muth (C. C.) 35 Fed. 524, 1 L. R. A. 44; Computing Scale Co. v. Standard Computing Scale Co., 118 Fed. 965, 55 C. C. A. 459; Lowe Bros. Co. v. Toledo Varnish Co., 168 Fed. 627, 94 C. C. A. 83; Seeger Refrigerator Co. v. White Enamel R. Co. (C. C.) 178 Fed. 567. In the last mentioned case the court said:

"As a general rule, a patentee has no right to give to his invention a name that may describe another device which does not infringe his own, and then claim that he has a right to enjoin a second inventor from using that name which is equally applicable to both."

In Hostetter v. Fries the court said:

"When a new article is made a name must be given to it, and this name becomes by common acceptation the appropriate descriptive term by which it is known, and therefore becomes public property. If this were not so any person could acquire the exclusive right to a formula by giving a name to the compound produced, not only when the compound has not been patented, but when it might not be the subject of a patent. All who have the right to man-

ufacture and sell the preparation have the right to designate and sell it by the name by which alone it is known, provided care is observed to sell the preparation as the manufacture of the seller and not the preparation made by another."

In Leclanche Battery Co. v. Western Electric Co. the court said:

"When an article is made that was theretofore unknown, it must be christened with a name by which it can be recognized and dealt in; and the name thus given to it becomes public property, and all who deal in the article have the right to designate it by the name by which alone it is recognizable."

In Rumford Chemical Works v. Muth the court said:

"While a court of equity should regard with disfavor, and seek to remedy, invasions of proper trade-marks, and to rebuke all unfair dealing by which the good will earned by one trader is unlawfully pirated by another, care must be exercised that protection is not granted to the appropriation of descriptive names in such manner that a perpetual monopoly is created in the article described, in favor of those who have no exclusive right to manufacture it."

In Computing Scale Co. v. Standard Computing Scale Co., Judge, now Justice, Lurton delivering the opinion of the circuit court of appeals for the sixth circuit said:

"If the complainant has a technical trade-mark in the word 'Computing,' its use by others will be restrained, for a wrongful intent in so using it will be presumed. But when the word is incapable of becoming a valid trademark, because descriptive or geographical, yet has by use come to stand for a particular maker or vendor, its use by another in this secondary sense will be restrained as unfair and fraudulent competition, and its use in its primary or common sense confined in such a way as will prevent a probable deceit by enabling one maker or vendor to sell his article as the product of another. * * * If the name fairly signifies some quality or function which the machine does or aids in doing, it cannot be regarded as an arbitrary or fanciful name; and if the word so adopted is one of common use, with a well understood primary meaning which is clearly descriptive of the article to which it is applied, or of some quality which it has, its exclusive use by one would manifestly deprive all others from using the same word in describing their own similar article or machine."

It is obvious that the rule established by the foregoing and similar cases against the right of exclusive appropriation of descriptive names of manufactured articles has equal and, indeed, stronger application to a natural product such as coal or trap rock.

The name "Birdsboro Trap Rock" not having been susceptible of appropriation as a trade-mark for trap taken from the dike referred to, the question is presented whether Dyer by adopting the name "Birdsboro Trappe Rock" acquired a right to exclude the defendant from using the former words in connection with the sale of trap quarried from the same dike. The words "trappe" and "trap" have the same sound, and, if in this country both had at the time of the adoption of the former and have since continued to have the same and a well-understood signification, it goes without saying that Dyer could not by mere appropriation and application gain an exclusive right to the words "Birdsboro Trappe Rock" as applied to stone taken from such dike. The word "trap" although derived from the Swedish word "trappa," meaning a step or stair, has been known and used as a common English name for igneous rock for more than one hundred years. And the words "trappoid," "trappous," "trappose" and "trap-

pean" are adjectives related to trap. But the word "trappe" is not and never has been in this country a descriptive name for trap rock. The designation "trappe rock" is unknown to the English language, and if the term "trappe" be known to that language it bears no relationship whatever to rock. According to the twentieth century edition of the Standard dictionary "trappe" is an obsolete Anglo-Saxon word signifying, not rock, but artifice or stratagem. It could only be applied in this country to rock as an arbitrary or fanciful word. If, as such arbitrary or fanciful word, "trappe" was adopted and applied by Dyer to stone quarried by him, whatever may have been his ulterior purpose, it is clear that any exclusive right thereby gained by him and his successors must be limited to the designation containing such arbitrary or fanciful word, and such limitation could in no wise be affected by a subsequent registration of the designation under the act of February 20, 1905 (33 Stat. 724, c. 592 [U. S. Comp. St. Supp. 1909, p. 1275]). No one can through the adoption and application of an arbitrary or fanciful word as a trade-mark for a certain article exclude others from using in connection with similar articles a geographical or descriptive name open to the public, on the ground that the latter name so closely resembles the former as to be calculated to mislead the purchasing public as to the origin, manufacture or ownership of the articles sold, or for any other reason. Were it otherwise one could by indirection practically acquire a monopoly in the use of such geographical or descriptive name of which the law forbids an exclusive appropriation. In Potter Drug & Chemical Corp. v. Pasfield Soap Co. (C. C.) 102 Fed. 490, the court said:

"A person cannot fashion a word, not theretofore existing, and thereafter exclude the use of an existing word, in its meaning suitably adapted to the nature of the article to be sold, where, as in the present case, the meaning of such word is quite distinct from the meaning suggested by the artificial word."

In American Tobacco Co. v. Polacsek (C. C.) 170 Fed. 117, it was held that the trade-name "Virgin Leaf" attached to the complainant's tobacco was not synonymous with "Virginia Leaf," nor was it descriptive of the tobacco used, but was "an arbitrary fanciful name intended to denote the purity of the tobacco," and was therefore a valid trade-mark; and that the defendant, having used the name "Virgin Leaf" in connection with the sale of cigarettes, claiming his use of these words to be merely by way of substitution for "Virginia Leaf," and descriptive of the tobacco of which the cigarettes were made, infringed the trade-mark of the complainant; and he was confined by the court to the use of the word "Virginia" instead of "Virgin." The court thus not only compelled the defendant to desist from the use of the arbitrary or fanciful name, but recognized its right to do what the defendant in the case now under consideration has done, namely, to use the appropriate geographical and descriptive term.

The complainant contends that the words "Birdsboro Trappe Rock" were validly registered as a trade-mark pursuant to the provisions of the registration act of February 20, 1905, and that, therefore, the defendant can and must be held liable as an infringer. That such designation, containing as an essential element the arbitrary or fanci-

ful word "trappe," could be registered under the act, is quite likely. But the words "Birdsboro Trap Rock" have never been registered as a trade-mark, if, indeed, they could. The complainant contented itself with the registration of the words "Birdsboro Trappe Rock." The defendant, while it has employed the words "Birdsboro Trap Rock," has not on any occasion used the words "Birdsboro Trappe Rock." If Dyer had duly adopted and applied without registration the last-mentioned words as a trade-mark for the sale of crushed trap from the Birdsboro dike, the complainant as his successor in business would have had no right, as has been shown, to prevent the defendant from using the former words as a geographical and descriptive designation. The complainant, not having such right in the absence of registration could not gain it from registration. While registration is made "prima facie evidence of ownership" and confers certain other benefits upon the owner of the registered trade-mark, it does not make a trade-mark either more or less exclusive than it would have been without registration. The extent of its exclusiveness is not in the least affected by registration. The same sound policy for the prevention of objectionable monopolies which will not permit one by the use of an unregistered trade-mark consisting of an arbitrary or fanciful word or term, to exclude others from using a descriptive or geographical name open to the public in connection with the sale of articles similar to those to which such arbitrary or fanciful word or term has been applied, operates in all respects with equal force and effect, notwithstanding the fact that such arbitrary or fanciful word or term has been registered. Section 5 of the act of February 20, 1905, when read in connection with other provisions, evidently contemplated that some marks used in commerce with foreign nations or among the several states or with the Indian tribes, other than proper or technical trade-marks might be registered, and that such marks, when registered, should have the same exclusive nature as proper or technical trade-marks, provided such marks had been "in actual and exclusive use as a trade-mark of the applicant or his predecessors from whom he derived title for ten years next preceding the passage of this act." It is urged on the part of the complainant that geographical and descriptive names may be registered after "the conditions of the ten year proviso of section 5 are fulfilled," and reference is made to certain cases in support of the point. It is not necessary to discuss the soundness or unsoundness of the views expressed in those cases, as such discussion would be wholly immaterial to the determination of the case now under consideration for the reason that the words "Birdsboro Trap Rock" were not registered. In view of the foregoing considerations the bill in so far as it charges trade-mark infringement cannot be sustained.

On the question of unfair competition in trade but little need be said. The bill alleges such competition but the evidence wholly fails to substantiate the charge. Both complainant and defendant had their independent quarries on the Birdsboro trap-dike. Each had equal right with the other to quarry trap from it, and to sell the same under a properly descriptive designation. While the plant of the

complainant is within a mile, and that of the defendant upwards of two miles, from Birdsboro, they are both situated on the same dike, and each of the parties can with equal truth employ the words "Birdsboro Trap Rock" in connection with the sale of stone as an appropriate geographical and descriptive name. For, as has already appeared, the name of the town was, according to general usage, originally adopted by Dyer in that connection, not as an arbitrary or symbolical designation, but because the ridge or dike extended or was supposed to extend "right from Birdsboro to the quarries." The name was, therefore, one which both the defendant and the complainant "may employ with equal truth and equal right for the same purpose." It is just as unreasonable to assert an exclusive right to use the words "Birdsboro Trap Rock" as it would be for one to claim a monopoly in the use of the words "Brandywine Blue Rock" or "Hockessin Kaolin" in connection with the sale of rock along the Brandywine river or clay in the valley of Hockessin. Further, the defendant used on its letter and bill heads and sample boxes such words in designating the stone quarried by it as clearly to inform customers that they were dealing with the defendant, and not with the complainant. And it has not been shown that the defendant on any occasion sold or attempted to sell its crushed stone as that of the complainant, or had any intention so to do, or made any false representation or practiced any deception on the subject, or that any one purchased the defendant's stone as that of the complainant, or was misled into a belief that stone furnished or offered for sale by the former was that of the latter. There is an utter absence of any evidence of fraudulent or wrongful intent on the part of the defendant; while there is positive evidence of its good faith in guarding against any misconception on the part of customers as to the ownership of the crushed stone sold by it. The case does not disclose the elements essential to constitute unfair competition in trade, and, the charge in that behalf failing equally with that of trade-mark infringement, the bill must be dismissed with costs.